## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| 1. MIRANDA SUMMAR, Individually; | § § | |
| 2. OLIVIA WELLS, Individually; | § § | |
| 3. PRISCILLA PENA, Individually; | § § | |
| 4. RHEANNA JACKSON, Individually; | § § | |
| 5. GABRIELLE GLIDEWELL, Individually; | § § | |
| 6. MORGAN BROWN RUSSELL, Individually; | § § § | CIV-21-473-G |
| | § § § § | |
| Plaintiffs, | § § | |
| | § § | |
| v. | § § | |
| | § § | |
| 1. THE STATE OF OKLAHOMA *ex rel* UNIVERSITY OF CENTRAL OKLAHOMA; | § § § | |
| | § § | |
| Defendant. | § § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiffs Miranda Summar, Olivia Wells, Priscilla Pena, Rheanna Jackson, Gabrielle Glidewell, and Morgan Brown Russell and for cause of action would show this Court and Jury as follows:

## PARTIES

1. Plaintiff Miranda Summar ("Summar") is an individual who, at the time of the sexual harassment, sexual assault and gender discrimination complained of herein, was a student

1

attending the University of Central Oklahoma. Summar is a resident of the state of Oklahoma.

2.  Plaintiff Olivia Wells ("Wells") is an individual who, at the time of the sexual harassment and gender discrimination complained of herein, was a student attending the University of Central Oklahoma. Wells is a resident of the state of Oklahoma.

3.  Plaintiff Priscilla Pena ("Pena") is an individual who, at the time of the sexual harassment and gender discrimination complained of herein, was a student attending the University of Central Oklahoma. Pena is a resident of the state of Oklahoma.

4.  Plaintiff Rheanna Jackson ("Jackson") is an individual who, at the time of the sexual harassment and gender discrimination complained of herein, was a student attending the University of Central Oklahoma. Jackson is a resident of the state of Oklahoma.

5.  Plaintiff Gabrielle Glidewell ("Glidewell") is an individual who, at the time of the sexual harassment and gender discrimination complained of herein, was a student attending the University of Central Oklahoma. Glidewell is a resident of the state of Florida.

6.  Plaintiff Morgan Brown Russell ("Brown Russell") is an individual who, at the time of the sexual harassment and gender discrimination complained of herein, was a student attending the University of Central Oklahoma. Brown Russell is a resident of the state of Oklahoma.

7.  Defendant State of Oklahoma *ex. rel*. University of Central Oklahoma (UCO) is an institution of higher education located in Oklahoma County, Oklahoma.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction of all civil actions arising under the Constitution, laws and treaties of the United States, 42 U.S.C. § 1988.

9.  Venue in this Court is proper under 28 U.S.C. § 1391 (b) because the events giving rise to this claim took place in this judicial district, and Defendant resides in this judicial district.

## GENERAL ALLEGATIONS

### The Legal Framework

10. At all relevant times, UCO received federal funding for its academic programs and activities and was subject to the requirements of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

11. Title IX protects students from discrimination "on the basis of sex," which includes protection from sexual harassment and sexual harassment.

12. In 2001, The Department of Education ("DOE"), published the *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512, Jan. 19,2001. ("2001 Guidance").

13. The 2001 Guidance, "…focuses on a school's fundamental compliance responsibilities under Title IX…."

14. The 2001 Guidance notes that "due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student."

15. The 2001 Guidance explains that "[Federal funds] recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees" and is therefore responsible for an employee's harassment or discriminatory conduct when the employee is carrying out these responsibilities. "The recipient, therefore, is also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence. This is true whether or not the recipient has

'notice' of the harassment."

16. The 2001 Guidance acknowledges that, "Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination."

17. It goes on to state, "These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations. *By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences."*

18. The 2001 Guidance recognizes that, "training for administrators, teachers, and staff and age-appropriate classroom information for students can help ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond."

19. The 2001 Guidance requires that a school's sexual misconduct policies be widely disseminated. To that end, "Distributing the procedures to administrators, or including them in the school's administrative policy manual may not by itself be an effective way of providing notice."

20. In April 2011, the Department of Education, Office for Civil Rights ("OCR") issued a Dear Colleague Letter ("DCL") as a "significant guidance document" to "provide funding recipients with information to assist them in meeting their obligations." The DCL provided the applicable framework for Title IX compliance through September 2017.

21. In September 2017, the Department of Education announced its intention to engage in rulemaking on the topic of Title IX, rescinded the 2011 DCL, and published a "Q&A on Campus Sexual Misconduct" to provide interim guidance for handling peer-on-peer sexual

harassment and sexual violence.

22. Effective August 1, 2020, the Department of Education issued its "Final Rule." Having previously addressed the issues only through guidance documents, the Department's Title IX regulations now recognize that sexual harassment, including sexual assault, is unlawful sexual discrimination and have the force and effect of law.

23. The Title IX regulations set forth the requirements for a school's response to reports of sexual harassment, including formal and informal resolution.

24. Specifically, schools must not offer or facilitate an informal resolution process to resolve allegations that an employee sexually harassed a student:

> *Informal resolution.* A recipient may not require as a condition of enrollment or continuing enrollment, or employment or continuing employment, or enjoyment of any other right, waiver of the right to an investigation and adjudication of formal complaints of sexual harassment consistent with this section. Similarly, *a recipient* may not require the parties to participate in an informal resolution process under this section and *may not offer an informal resolution process unless a formal complaint is filed. However, at any time prior to reaching a determination regarding responsibility the recipient may facilitate an informal resolution process, such as mediation, that does not involve a full investigation and adjudication, **provided that the recipient …does not offer or facilitate an informal resolution process to resolve allegations that an employee sexually harassed a student*. 34 C.F.R. 106.45(b)(9)(iii).

**The Regional University System of Oklahoma ("RUSO") Title IX Policy**

25.  UCO is a member of the Regional University System of Oklahoma ("RUSO").

26. According to RUSO's "Title IX – Sex Discrimination, Sex-Based Misconduct and Sexual Harassment Policy," the system and its member universities "are committed to providing an educational, living and working environment that is free from discrimination based on sex for all members of its community to include students, faculty, staff, contractors, and visitors….All members of RUSO are expected to adhere to the requirements of this Policy and the standards of each member university."

27. The "University Policy" page on UCO's website provides a link to the RUSO policy under the heading of Discrimination and Harassment.

28. The RUSO policy purports to provide the exclusive means for addressing reports of sexual harassment or sexual misconduct: "Alleged conduct reported pursuant to this Policy, whether or not the conduct constitutes a violation of this Policy, may violate other RUSO or university policies. The member university reserves the right to take disciplinary action for conduct reported under this Policy that constitutes a violation of any other university policy. *If dismissal, suspension, or any other discipline of a faculty member or student is recommended as a result of a violation of this policy, the RUSO Title IX policy is the exclusive forum for such discipline and any appeals related thereto. The processes related to dismissal, suspension, or any other discipline set forth in* RUSO policy Chapter 3 (Academic Affairs) and Chapter 4 (Student Affairs) and *any related member university policies are superseded hereby and do not apply to faculty or students who have been found to have violated the RUSO Title IX policy and the discipline recommended as a result thereof.*"

29. The RUSO policy distinguishes between reporting incidents of sexual harassment and filing a formal complaint regarding an incident of sexual harassment. According to the policy, "[r]eporting incidents of Sexual Harassment informs the member university of the incident, allowing the member university to provide Supportive Measures to the Complainant and does not necessarily result in the initiation of the grievance process (as described in Section 4.03 of this Policy). Complainants who report incidents of Sexual Harassment will be offered individualized Supportive Measures. If a Complainant wishes to initiate the grievance process, they must file a Formal Complaint.

30. The RUSO policy provides that " Complainants may file a Formal Complaint with the Title IX Coordinator or the Deputy Title IX Coordinator. ***In order for corrective or disciplinary action to be taken against a RUSO or member university employee or student, it may be necessary for a signed Formal Complaint to be filed and for the Complainant to cooperate with the member university's investigative process***. However, a Complainant alleging sexual harassment may be offered individualized Supportive Measures. A signed Formal Complaint can be provided to the Title IX Coordinator or Deputy Title IX Coordinator by mail, email, or in person. The Formal Complaint must include the specific allegations and name of the Respondent(s). Title IX Coordinators may proceed with Formal Complaints without a Complainant signing it."

31. The RUSO policy provides for informal resolution: At any time after the filing of a Formal Complaint and but not less than ten (10) days prior to a live hearing, either party may request that the member university facilitate an informal resolution. Informal resolution is an available option when both parties voluntarily agree to participate and if the Title IX Coordinator agrees that informal resolution is appropriate given the nature of the allegations and the relationship of the parties.

32. The RUSO policy fails to recognize that Title IX regulations specifically prohibit informal resolution of complaints by a student against an employee.

### UCO's Equal Opportunity Statement

33. UCO approved the  following Equal Opportunity Statement in 2015:

The University of Central Oklahoma (University) is committed to an inclusive educational and employment environment that provides equal opportunity and access to all qualified persons. The University will continue its policy of fair and equal employment

and educational practices without discrimination or harassment because of actual or perceived race, creed, color, religion, alienage or national origin, genetic information, ancestry, citizenship status, age, disability or handicap, gender, marital status, veteran status, sexual orientation, gender identity or expression, or any other characteristic protected by applicable federal, state, or local law. Discrimination or harassment in violation of this policy should be reported to the Affirmative Action Officer (Diane Feinberg, Assistant Vice President of Human Resources) in person at 204 Lillard Administration, or by phone at (405) 974-2658 or fax at (405) 974-3827. After office hours or on holidays, the report may be made by contacting University Police Services at (405) 974-2345.

### UCO's Sexual Relationship Policy

34. UCO addresses sexual relationships between employees and students through policy: 1.4.1 SEXUAL RELATIONSHIP POLICY**:** The University affirms its commitment to the fair exercise of academic and employment power and adequate protection of individuals with limited power. University employees, including administrators; faculty; coaches; extracurricular, extramural, and intramural activities supervisors; graduate assistants; and staff should demonstrate respect for students as individuals and adhere to their proper roles as academic guides, counselors, and facilitators. Employees must refrain from any exploitation of students and other employees. Such use of power to create sexual relationships will be dealt with promptly and confidentially by the university administration.

35. The Sexual Relationship Policy prohibits sexual conduct with students:

1.4.2 SEXUAL CONDUCT WITH STUDENTS PROHIBITED: No employee shall engage knowingly or attempt knowingly to engage in consensual or nonconsensual sexual conduct with any student whom the employee supervises, acts as academic advisor for, or over whom the employee has any power to determine the student's grade; honors; discipline; research opportunity; scholarship opportunity; acceptance in a graduate or other program of study; participation in arts, athletic, academic, or extracurricular competition; work-study assignment; or similar education-related matter. University employees' sexual liaisons with students in such situations exploit position, abuse power, and fundamentally harm the academic relationship. Voluntary intoxication with drugs, alcohol, or other substances shall not negate knowledge.

36. The Sexual Relationship Policy defines sexual conduct:

1.4.4 DEFINITION OF SEXUAL CONDUCT: "*Sexual conduct*" includes, but is not limited to, any act, erotic touching, romantic flirtation, conversation of a carnal nature, advance or proposition for sensual activity, erotically explicit joke, remark of a carnal nature describing a person's body or clothing, display of an erotic object or picture, and physical contact reasonably believed to be of a sensual or flirtatious manner. "Sexual conduct" does not include reasonable use or delivery of bona fide lecture and/or instructional acts, statements, or materials.

37. The Sexual Relationship Policy provides for sanctions:

1.4.5 SANCTIONS: Sexual conduct with students or employees in violation of this policy will not be tolerated. Appropriate disciplinary action may include a range of actions up to and including dismissal and/or expulsion.

## **The Factual Background**

38. The University of Central Oklahoma ("UCO") is a public university with an undergraduate enrollment of approximately 14,000 students.

39. Kato Buss ("Buss")  is an associate professor and has served as the chairperson of UCO's Department of Theatre Arts for the past four years. Buss has recently been promoted to Interim Assistant Dean of the College of Fine Arts and Design.

40. Buss teaches courses in acting, directing, theatre history, dramatic literature and coordinates a study tour program in which he takes groups of students abroad each summer.

41. Over a period of years, Buss engaged in inappropriate behaviors that were calculated to and did result in a sexually hostile environment for female students in the theatre program.

42. Buss targeted vulnerable young women, in some cases while they were still high school students. At recruiting events, he paid particular attention to girls who did not have parental support, were first generation college students or who did not have financial resources. He lavished them with praise, telling them they were smart, talented and mature. Buss lured them to UCO with promises of scholarships and acting opportunities.

43. Each year, Buss chose a select freshman or two to add to his close inner circle of favorites. The favorites were always female and his approach was always the same. The chosen student received special one- on- one time and private coaching for auditions. Buss invited his favorite young women to go on multiple out of state school events and went out of his way to secure scholarship funds to ensure they could participate.

44. The young women were thrilled to receive Buss' attention and praise. They felt valued and special. They were excited to learn from Buss and grateful for the opportunities he provided them.

45. As the young women spent more and more time with him, Buss probed them for details about their families and personal lives He began to share details about his own. Buss mocked other students and faculty members, drawing the young women closer to him while isolating them from their peers and faculty. Interest and support turned to manipulation and betrayal.

46. Buss communicated with each of the young women privately via text and Snap Chat. He met with them alone in his office, always with the door closed.

47. On school sponsored trips, both out of state and out of the country, Buss drank alcohol with students, including under-age students,  in his hotel room. He transported the students who were over 21 to buy alcohol who in turn shared the alcohol with the underage students with Buss' knowledge and approval. Buss became intoxicated on multiple occasions during these student trips.

48. Chris Domanski, the then- assistant dean for UCO's College of Fine Arts and Design, witnessed Buss's actions on at least one of these trips and also provided alcohol to underage students.

49. Buss engaged in behavior that created a sexually charged environment. Buss flirted with the young women and made frequent sexual innuendos. He remarked about the young women's appearances, commenting on their hair, their breasts and their clothing.  He touched them in ways that were offensive and  made them uncomfortable, including grabbing their buttocks and embracing them with full frontal hugs. The young women were left feeling conflicted and confused. Buss had so successfully blurred the boundaries between professor and student that they could no longer trust their own instincts as to what was appropriate.

50. Plaintiffs all heard rumors from the time they became involved in the UCO theatre department that Buss was involved in a sexual relationship with an older female student. They all chose to ignore the rumors and grew more devoted to Buss.

51. However, the rumors became truth for one of the Plaintiffs. During the Fall semester of 2017, after two years of grooming, Plaintiff Summar succumbed to Buss' advances. The two began engaging in physical sexual activity in his office before and after rehearsal.

52. In December 2017, Plaintiff Brown Russell reported to UCO that Buss had grabbed/slapped her buttocks during an out-of-state trip. Brown Russell also outlined Buss' use of alcohol with students and other harassing behaviors.

53. Plaintiff Glidewell provided a statement in support of Russel's Title IX Complaint and attempted to report her own experiences with Buss' inappropriate behavior and sexual harassment.

54. UCO failed to fully investigate Brown Russell's complaint that Buss touched her inappropriately, rushing through the process and failing to interview witnesses named by Brown Russell. UCO ultimately found Buss "not responsible" for Brown Russell's allegations.

55. UCO did not consider Glidewell's report as a Title IX complaint. Rather, Deputy Title IX Coordinator Adrienne Martinez referred to the incidents Glidewell reported to be "managerial concerns" more appropriately handled by Employee Relations.

56. Included in Brown Russell's Title IX Complaint was an allegation that Buss was involved in a sexual relationship with Summar. UCO spoke briefly to Buss and Summar who denied that they were involved in a romantic or sexual relationship. Buss convinced Plaintiff Wells that Brown Russell's accusations were false and manipulated her into defending him.

Notably, Wells informed Martinez that Buss had approached her prior to her interview and discussed with her how she should respond to the investigator's questions. Martinez seemed uninterested in Buss' attempts to interfere with the investigation.

57. In March 2018, the Title IX Coordinator advised Brown Russell and Glidewell that the following directives had been given to Buss:

    1. Refrain from travel with groups that [Glidewell and Brown Russell] attends.
    2. Provide a liaison for administrative needs as needed (chair permissions, etc.) for [Glidewell and Brown Russell.]
    3. Maintain compliance with overnight-trip alcohol policies by utilizing the Office of Student Conduct for behavioral expectation briefing.

58. The Title IX Coordinator related that Buss was given the following "additional advice:"

    1. Consider how to deliver feedback to students from third-parties, where that feedback may seem sexual in nature, or relate to physical appearance.
    2. Refrain from consuming alcohol with current students whenever possible.
    3. Maintain annual Sexual Misconduct & Gender-Based Harassment training annually as required by all faculty/staff to be better educated on UCO Discrimination and Harassment policies.
    4. Minimize, wherever possible, the perception of favoritism in the Department of Theatre Arts.
    5. Minimize any remarks that may be construed as flirtatious or containing innuendo of a sexual nature.
    6. Minimize physical contact with students. If you are going to hug a student, obtain permission first.

59. Buss' behavior did not improve after the December 2017 complaints. Throughout 2018, 2019 and 2020, Buss continued to engage in sexual misconduct with Summar, continued to target and begin grooming young women as they entered the program, continued to sexually harass and manipulate his "favorites," and continued to become intoxicated and provide underage students with alcohol. His behavior instead escalated and he retaliated against the young women who complained.

60. While female students in the theatre department were struggling after having been dismissed and discredited, Buss was being rewarded by the university with accolades and promotions.

61. In September 2020, Plaintiff Summar filed a Title IX complaint through UCO's website. She acknowledged that she had in fact been involved in a sexual relationship with Buss and explained that she had been manipulated to lie to protect him. She named Plaintiffs Wells, Pena and Jackson as witnesses.

62. In October 2020, Plaintiff Wells joined Summar as a co-complainant and shared her own experiences with Buss' abusive, manipulative and sexually inappropriate behavior.

63. A "no contact order" was entered and another theatre professor was named to act as an intermediary between Wells and Buss.

64. On October 26, 2020, Erika Cerda, UCO Director of Employee Relations, contacted Wells and Summar via email. She made them aware of a "frank" meeting she had with Buss in which he took "some initial responsibility." She explained that she would be meeting with him "at length later this week to obtain a better understanding of his perspective and recounting."

65. In the same message, Cerda advised Wells and Summar:

*We have a few things to decide at this point, chiefly whether this moves forward as an informal or formal resolution*. The words are imperfect. Both methods can have the same low or high level consequences. Really, what we're talking about is the process. *Informal processes are HR processes, where we take undisputed facts and work with senior leadership to determine consequences. Nothing is less serious in this process however it can move much quicker.* The formal Title IX process for this case would include each Complaining or Responding party reviewing a document of all gathered information and testimonies with a 10-day rebuttal period. Then, I would create a credibility analysis. Finally, a decision maker would determine whether a policy violation occurred and, if so, what sanctions (consequences) would be involved.

66. On November 6, 2020, Wells and Cerda were scheduled to meet separately with Cerda and Mary Deter-Billings, Manager of Employee Relations.

67. Cerda updated Wells on her conversation with Buss, acknowledging that Buss admitted most of the allegations she and Summar presented. According to Cerda, Buss admitted full responsibility for Summar's allegations and told them not to question the credibility of Well's accounts. Cerda encouraged Wells to forego the formal Title IX process and opt instead for an "informal HR process." Cerda expressed her opinion that, since there were no issues of credibility, Title IX would draw things out unnecessarily. She told Wells that "If it were my children, I'd want swift action taken."

68. Similarly, Cerda discussed with Summar the differences between the Title IX and HR processes. She mentioned that  Summar's "case" did not really fall under "the umbrella" of Title IX because of the time that had passed and stressed the swiftness of the HR process. Cerda convinced Summar that the informal HR process was the better course of action, assuring her that both carried the same weight with the university and the consequences were the same.

69. On December 17, 2020, Wells and Summar received an email containing a series of confusing and contradictory statements and references to university policy. First, the letter provides that Summar's "report involves an alleged policy violation(s) from the current University of Central Oklahoma (UCO) Discrimination and Harassment Policy" and indicates that she may access a current copy of the policy at https://www/uco.edu/offices/policy/files/equal-opportunity-statement-pdf.   The   linked document is UCO's Equal Opportunity Statement set out in Paragraph 24 above. The Equal

Opportunity Statement directs not to the Title IX Coordinator but to the "Affirmative Action Officer (Diane Feinberg, Assistant Vice President of Human Resources)."

70. According to the December 17, 2020 letter, Summar's allegations "are based on a report that the Respondent has participated in grooming and manipulation, resulting in a non-consensual sexual relationship as well as an environment of favoritism." The letter expressly acknowledges that the report contained allegations that **an employee** engaged in sexual misconduct directed at **a student**.

71. In direct contravention of the Title IX regulations which prohibit information resolution where the allegations are made by a student against an employee, the December 17, 2020 letter goes on to state:

> Per our discussion, the University offers two forms of resolution for reports of Prohibited Conduct: (1) Informal Resolution (as described in Section I.5.3.A), which includes a variety of informal options for resolving reports, and (2) Formal Resolution, which involves an investigation and review and possible sanctions (if applicable) by the appropriate University Manager (as described in Section I.5.3.B).

72. UCO did not provide copies or links to the referenced policy sections and Plaintiffs have been unable to locate policies so numbered in any available resource.

73. The December 17, 2020 letter indicates that "Informal Resolution" was pursued and "a combination of interventions and remedies have been utilized." The letter states that the University has implemented relative sanctions against Respondent and considers the matter resolved and closed."

74. Cerda refused to disclose the nature of the "relative sanctions."

75. Buss continues to teach, direct productions, contact students outside of class. Far from disciplining him, UCO has emboldened him, allowed him continued access to young women and even rewarded him with promotions.

**Plaintiff Miranda Summar**

76. Plaintiff Miranda Summar ("Summar") met Buss for the first time in 2015 in the Fall semester of her Freshman year at UCO when she decided to change her major from undecided to theatre arts.

77. Buss took an immediate interest in Summar and, as a first-generation college student, Summar welcomed his advice and assistance. Buss went out of his way to provide Summar scholarship money and offered her private coaching for auditions.

78. In the Fall of 2016, Summar's sophomore year, Buss cast her in her first production at the university. Her role was "Sex" and her costume was lingerie. She was 19 years old.

79. Summar quickly realized she was one of Buss' "favorites." Buss texted her frequently, called her in for one-on-one meetings in his office and provided her with private coaching. Summar looked up to Buss and was happy to be one of the young women to whom he paid special attention.

80. In the Spring of 2017, Buss invited Summar to attend multiple out-of-state events. Alcohol was involved in all of the events. Buss facilitated drinking by students – including by Summar and other underage students. Buss joined in the drinking and on one occasion walked around the hotel drunk carrying a large bottle of whiskey.

81. Buss took Summar, Olivia Wells and three other female students to a school sanctioned event that Spring in Tennessee. Buss used the trip as an excuse to drink alcohol and texted Summar and Wells late one night for snacks because he was drunk and hungry.

82. Buss drove several female students to another out-of-state festival the same semester. IT was on this trip that Buss began referring to Summar as his "baby." He flirted with her and made remarks about her appearance, calling her "beautiful."

83. During the Summer of 2017, Summar went on a study tour to Scotland with Buss and several other students, including Wells. Buss supplied scholarship funds to enable Summar to attend. Throughout the trip, Buss showered Summar with attention. He took Summar and Wells to a play but did not invite the other students who were on the tour. Buss texted Summar daily. He told Summar he had an estranged relationship with wife and made constant innuendos to her about his romantic and sexual feelings toward her.

84. In the Fall of 2017, Buss' pressure on Summar increased. He cast her as the lead in his production. During rehearsal, Summar went to his office before and after rehearsal for private coaching. One night, after the other cast members had left, the two engaged in sexual activity. The sexual acts, including kissing, oral sex and groping, continued in his office before and after rehearsals. Summar was 19 years old. Buss was in his late forties.

85. Summar confided in Rheanna Jackson about the romantic and sexual relationship that Buss had fostered with her. At the time, Summar believed that Buss was in love with her and she was in love with him.

86. In December 2017, a former student alerted Summar that Morgan Brown (now Brown Russell) was filing a Title IX complaint against Buss and had alleged that Summar and Buss were involved in a romantic relationship. Summar denied the relationship to the student and reported this information to Buss.

87. Summar met with Buss in his office on a Sunday afternoon prior to Buss being contacted by UCO's Title IX officer. Together they deleted text messages and other digital communication reflecting their involvement with each other.

88. After Buss received the report and learned that evidence had been provided establishing that he had been to Summar's apartment, he and Summar agreed that they would tell the Title IX investigator that he had been dropping off a book.

89. When Summar was contacted, she denied the relationship and explained the reason for Buss being at her apartment directed. She was never contacted about the report again.

90. Buss continued his relationship with Summar through the Spring of 2018. They stopped meeting in his office as frequently. Instead they met in a parking lot where she would get in his car and they would drive around. On one occasion, Buss invited Summar to his home when his wife was out of town.

91. Summar noticed that Buss was very angry with Brown Russell for filing the Title IX complaint and was hostile toward her.

92. During her first few semesters at UCO, Summar heard rumors of Buss having relationships with female students but chose not to believe them. He had convinced her that she was special and that she was the only student he had ever been involved with.  Now, however, Summar began to doubt Buss' truthfulness and the genuineness of his feelings toward her. She tried to distance herself from him and eventually stopped responding to his messages unless they were school related.

93. In the Fall of 2018, Summar began to plan for graduate school auditions. Buss again increased the amount of attention he paid her. He offered private coaching and told other directors they could not cast her in their shows because he had to have her. Buss continued to contact her after her graduation in May 2019.

94. Throughout 2020, Summar struggled with the trauma of her experiences in the UCO theatre department and Buss' exploitation. Finally, she shared what had happened with Wells and other close friends. In September 2020, she filed her Title IX report.

## Plaintiff Olivia Wells

95. Plaintiff Olivia Wells ("Wells") entered the UCO Department of Theatre Arts in the Fall of 2015 at age 18 after being recruited by Buss. From the beginning it was clear she was his new favorite student.

96. Wells received special privileges, including more private coaching and better opportunities that most of Buss' other students.

97. At a competition, Wells recalls Buss obsessing over her long curly hair, telling her it made her look "wild." She felt very uncomfortable but at the same time empowered by his interest.

98. Upperclassmen told Wells she was "THE freshman," and that Buss was really interested in working with her in his next production. He summoned her to his office many times to read the script for him even though the script had not been released to other students.

99. Buss demanded loyalty from his "favorites." He frequently expressed his dislike for the female theatre professor who was Well's acting teacher If Wells spent too much time with her, Buss would become angry and punish her, giving her the silent treatment.

100. Wells travelled to Texas to observe auditions for prospective fine arts students with Buss. During the trip, Buss told her repeatedly that he planned to cast her in the lead of the next play. At dinner one evening, Buss got drunk and became very emotional  about their relationship and her work at UCO.

101. During a rehearsal, Buss told Wells to kiss her scene partner. Buss did not ask either if they were comfortable with the kiss and required them to do it in from of the cast and stage management team.

102. Buss drank heavily during school trips and provided alcohol to students, including underage students. During a trip in the Spring of 2017, Buss came to most of the events intoxicated. He asked Wells to read his tarot card while extremely drunk and made inappropriate comments throughout  the reading. Buss either asked Wells if he could "touch" her or "hit" her.

103. In the Fall of 2017, both Wells and Summar were called back for the role Buss had promised to Wells. Summar was offered the role. Wells was very emotional as she felt manipulated and deceived by Buss' promises. In response, Buss cried and told her that he was sorry that she had been hurt.

104. During rehearsal, Summar came to rehearsal two hours early every day for private coaching. Buss showed her much more attention than the rest of the cast and emotionally exploited her in the rehearsal room. Before shows, Buss pulled Summar aside privately and talked to her. After the last show, he was an emotional wreck, hugging  Summar and not acknowledging the rest of the cast. Wells learned later that it was during this time that the sexual relationship between Buss and Summar began.

105. Buss' manipulation of Wells continued as he tried to defend himself when the relationship with Summar was exposed in connection with Brown Russell's 2018 Title IX Complaint. Tipped off about the report, Buss texted Wells and asked to meet with her privately. Weeping, Buss told Wells that the allegations were untrue and that Brown Russell was trying to ruin his marriage, career and life. Buss told her that he had lost weight and was

struggling with his mental health as a result of the report. He begged her to believe him and asked her to be a "character witness" for him. At the time, Wells believed him. So blinded by her loyalty to Buss, she did not appreciate how inappropriate it was that he contacted her before she was interviewed. The Title IX Coordinator ignored Buss' interference too.

106. Wells remained in denial about Buss' sexual misconduct. He had successfully groomed her to serve his emotional needs by sharing information with her about his marriage and personal life. He exploited her classmates by sharing private information about them and openly mocked his colleagues to her.  He pitted Wells and Summar against each other, forcing them to compete for his attention and affection.

107. Buss made Wells promises of a career and opportunities to be an actress. She ignored the discomfort she felt when he called her hot because he praised her brain and her talent too. Buss had convinced her that her success as a young actress and an academic was totally dependent on him.

108. When Summar confided in her that Buss had in fact manipulated her into a romantic and sexual relationship as Brown Russell had alleged, Wells was finally able to acknowledge the uncomfortable feelings she had denied. She realized that she had been carefully groomed, manipulated and controlled to keep Buss' secrets.

109. Wells is currently enrolled in UCO seeking a second undergraduate degree.

**Plaintiff Priscilla Pena**

110. Plaintiff Priscilla Pena ("Pena") first met Buss in the Fall semester of 2018 when she changed her major from biology to theatre arts. She was excited about pursuing a career

she was passionate about and she eagerly enrolled in Buss' Foundation of Theatre Arts class.

111. Buss took an immediate interest in Pena. He was caring and attentive, offering the support and encouragement for a creative career that she did not find at home. He frequently pulled her into his office to speak with her individually and offered her private coaching for auditions. She began to see Dr. Buss, her professor, as Kato, her friend.

112. During her first semester in the theatre department, Pena was cast as in Plaintiff Miranda Summar's piece for a show that Buss was supervising.  More roles in Buss' productions followed.

113. In May 2019, Buss arranged for Pena to receive a scholarship to go on a New York Study tour with him and small group of art students. During the trip, Buss got tickets for Pena and another female student to attend a show with him where alcohol was being served. Immediately upon entering the theatre, Buss offered to buy the young women drinks – despite clear admonitions that alcohol was not to be permitted on the trip at any time. Throughout the trip, Pena and the other students would find Buss at the hotel bar drinking.

114. As a result of flight cancellations, Pena found herself alone with Buss in the Chicago airport on the way back to Oklahoma. He offered to buy her lunch and since she was out of money due to the unexpected delay, she accepted. During the lunch, Buss shared details of his personal life, including his marriage and made negative comments about his relationship with his UCO colleagues. The boundaries were blurred even greater.

115. A few months later, in July 2019, Buss again found scholarship funds that allowed Pena to travel to Scotland for another study tour to the famous Fringe Festival. Pena was assigned an extremely vulnerable part in the Buss' show, which required her to burst into

tears. Buss, who was also performing in the show, positioned himself next to her on the stage and exploited her vulnerability. After directing her to look into his eyes after the very emotional scene, he would whisper to her on stage, "You did beautiful," and sometimes even hug her. During the trip, Buss would nudge her playfully showing physical affection and say, "love you." Pena was confused and conflicted. She wanted to believe that he was just being supportive but it felt wrong and made her uncomfortable.

116. Buss continued to suggest Pena to work on film projects and paid stage readings. He selected her and a few other students to film a movie in his home.

117. Buss texted Pena often, sometimes while she was in class just to "catch up." He reached out to her every time she was cast in any show, offering his congratulations and reminded her he was supporting her. Although Pena found Buss' frequent contact inappropriate, she was afraid to say anything for fear of upsetting or offending him.

118. In the Spring of 2020, Pena confided in Summar that she was increasingly uncomfortable and felt pressured to live up to being one of Buss' "favorites." Summar warned her to "be careful around Kato."

119. In October 2020, Pena was interviewed as a witness in connection with Summar's Title IX report. She declined a "no contact order," concerned that she would be vulnerable to retaliation is Buss found out she had provided information.

120. Pena informed another professor that she planned to skip an audition during the Fall semester because she knew Buss would be casting. Buss contacted her through text and told her that she "should really sleep on it" because he had a role in his show for her. She did not reply.

121.  Pena's anxiety was heightened when she learned that despite Summar's complaint, Buss would still be employed at UCO. She has struggled to maintain her grades and has missed classes. She finds it difficult to walk around campus knowing that he is still there.

### Rheanna Jackson

122. Plaintiff Rheanna Jackson met Buss in 2016 at a UCO "Drama Day" recruitment event when she was were just  17 years old. Most students, if not all, were brought to the event by a parent. Jackson was brought by her high school drama teacher. Buss noticed.

123. Buss singled Jackson out, spending considerable time talking to her alone during this first meeting and others that followed. Buss flattered Jackson and made inappropriate comments. During a high school theater festival, Buss told Jackson that the room full of adults – mostly male college recruiters – were "all drooling over" her.

124. Buss told Jackson which colleges to meet with and which to blow off. Multiples times at the festival he got Jackson alone in a small hallway, always standing a bit too close for comfort, and made comments on how special, smart, talented, and mature she was.

125. While Jackson was still in high school, Buss invited them to see a show at UCO. Thrilled he would invite them, Jackson agreed. The two exchanged multiple emails about where to meet, and Buss bought her a ticket. Before, during, and after the show, Buss kept telling Jackson how special she was to be there with him. At one point during intermission he leaned over and said, " I never do this with students, you are really special, I bet everyone is wondering what we are doing here together."

126. A couple of months after Jackson started at UCO, Buss became very interested in her again. He began asking for meetings alone in his office, inviting Jackson on trips out of state, bonding with her over parent issues and abuse history. During these meetings, Buss always

closed his office door. Buss asked intensely personal questions and told Jackson about his own history of abuse.

127. During the Spring of 2017, Buss began inviting Jackson on several away trips. Buss used these trips to spend time with his "favorite" students. On every trip, there was underage drinking that Buss not only knew of but encouraged. Jackson witnessed Buss have inappropriate conversations and interaction with students while he was drunk.

128. During one of the trips, Jackson noticed that Buss was paying a lot of extra attention to Summar. There were rumors Buss was dating another student at the time and that student was also on the trip.  Jackson saw that student leave Buss' room one morning at 4 a.m., after a night of drinking. Jackson knew something bad was happening but could not yet acknowledge it.

129. Buss  invited Jackson on a trip to Scotland to participate in a theatre festival. He offered scholarships for going but told Jackson to "figure out the money aspect of it." During the Scotland trip Buss began engaging in degrading and humiliating tactics in addition to isolating Jackson from Wells and Summar. Buss would go out of his way to exclude Jackson from events and conversations on this trip. Buss invited Summar and Wells to events and shows while he ignored Jackson.

130. Shortly after casting for Fall 2017 was announced, Summar confided in Jackson that she and Buss were engaging in a sexual acts. Summar informed Jackson that Buss was sexually abusing her in his office. This secret began to weigh on Jackson.  She struggled to reconcile her conflicting feelings about Buss.

131. On one occasion when Summar and Jackson were in Buss' office, Buss began playing a video he had recorded of Summar for a previous show. When Jackson caught Buss making

obscene gestures to Summar's face and body, Buss just laughed. Jackson the office feeling confused and violated.

132. Jackson was hospitalized for a suicide attempt during this time. The pressure of knowing about the sexual abuse triggered an intense depressive episode.

133. Brown Russell told Jackson after rehearsal one night that Buss had assaulted her. Jackson disclosed to Brown Russell the information Summar had shared about Buss' abuse and they decided to file a Title IX report. Jackson provided texts from Summar stating that Kato was at her house and was engaging in an inappropriate relationship with her.

134. Nothing happened as a result of the report. Buss was allowed to go on trips with students after the investigation concluded. Summar knew Jackson participated in reporting her relationship with Buss, and  they grew distant. Buss cut off all contact with Jackson. He further isolated and ostracized her from the group.

135. Jackson dropped out, feeling unwelcome at UCO because of her participation in the report against Buss. However, after a few semesters off, Jackson wanted to go back to UCO in 2019. Jackson did not have the money to attend, and since Buss had completely shunned her, she assumed she would not be able to obtain any scholarship funds.

136. Although uneasy, Jackson contacted Buss to ask for his help. Buss responded that he wanted to meet in his office and talk. When the two met, Buss told Jackson he wanted to cast her in show that year and offered scholarships. Reluctant but desperate to return to school, Jackson agreed to be in Buss' show and accepted his promises of financial assistance.

137. Jackson tried to put forget about Buss' past misconduct and abuse. It seemed the university and the theatre department had, so, she thought, she should too. Buss arranged for her to attend classes and promised that she would receive credit once the scholarships came in.

138. Buss offered Jackson a large role in his show, let her pick out her own monologue, and gave her more creative control than ever before. Jackson felt special again. And after being degraded or ignored, it was a welcome change. However, this treatment would not last.

139. Jackson began to feel very uncomfortable at rehearsal and she did not want to be in a room alone with Buss anymore.

140. After the show ended, Jackson never received the scholarship money Buss promised. Jackson could not afford school, and the discomfort of knowing Buss was an abuser was just too much. Jackson stopped going to class. Buss he never reached out to her again or offered any update on the scholarships. Jackson dropped out again after the Spring of 2019.

### Gabrielle Glidewell

141. Plaintiff Gabrielle Glidewell ("Glidewell") developed a rapport with Buss through the Freshman Introduction to Theatre class he taught. Glidewell had just been through a troubling incident involving the sexual assault of another student for whom she served as a witness in a Title IX complaint. As a result of the incident, Glidewell quit debate and lost her source of scholarship funding. She was feeling lost and Buss stepped in.

142. Buss encouraged Glidewell to attend the 2016 summer study tour abroad and arranged for her to receive scholarships to pay for the trip. Seven students travelled to Scotland to attend and perform in an international theatre festival. Glidewell was one of two students who were transitioning from Freshman to Sophomore.

143. Glidewell was part of the ensemble of the show along with two other female students. The young women's costumes were very revealing. Buss made comments about how Glidewell looked in her costume and would find excuses to touch her. Buss spent time with the young women in the small bathroom of the Airbnb, teaching them how to apply clown makeup.

144. During the trip, Buss frequently went out drinking with the students. He took Glidewell and one other student to a show, leaving the other students behind. He told Glidewell that she was special and promised her a role in his Fall show. He convinced Glidewell to change her major from Theatre Education to Theatre Performance. Buss was the head of Theatre Performance.

145. Glidewell started her sophomore year as a Theatre Performance major and desperately wanted to be one of Buss' "favorite" students. It was well known that he had a group of students that he favored who routinely go the best roles, the best scholarships and had the easiest time in his classes. He favored the female students and seemed to have a special relationship with one of the women in particular. Glidewell suspected that something was going on between Buss and the female student while they were on the study abroad trip but she assumed that was just the way theatre and college was.

146. In the Fall of 2016, after giving her the script early in a closed-door meeting, Buss cast Glidewell in his show, *Love and Information*. The *Love and Information* rehearsal and performance process was traumatizing. Buss insisted that the cast talk about their deepest insecurities and traumatic life events during rehearsals and regularly screamed at them if they failed to meet his expectations.

147. After Buss screamed at Glidewell or when he forced her into an emotional breakdown, he would rub her back, shoulders or hair, hug her and tell her she did "beautiful."

148. Buss seemed particularly interested in the fact that Glidewell was openly bisexual and was dating another woman at the time. He paired her with the only openly gay woman and told Glidewell to "fall in love" with her scene partner. Buss ignored Glidewell's pleas to intervene when her scene partner constantly tried to physically harm her.  He paired two other female students and had them kiss in their scene. No one else in the cast knew about the kiss until the week before the show.

149. Buss encouraged Glidewell to bring her girlfriend to theatre events and seemed to want to watch them be physical with one another. Buss spent considerable time during closed-door meetings with Glidewell in his office discussing her sexuality and showed an inappropriate interest in her relationship with her girlfriend.

150. Buss communicated with Glidewell primarily through Snapchat and would regularly not respond to school related emails.

151. Glidewell began to feel like one of Buss' favorites. He asked her to do extra things for him and made her feel special. She spent her sophomore year trying to please Buss so that she could get good roles and good scholarships. Buss made it seem like he controlled all aspects of her degree and her potential career.

152. During the Spring of 2017, Buss was the faculty member in charge of Glidewell's undergraduate research, He approved her timesheets which in turn impacted her receipt of grant funds and worked on her research with her.

153. During an out of state trip in the Spring of 2017, Glidewell noticed troubling  interactions between Buss and the female student she suspected was involved in a relationship with

him. The female student would frequently come back to the room she shared with Glidewell drunk and upset after having been with Buss. Buss drank with and gave alcohol to the students on this trip.

154. Buss' attitude toward Glidewell became increasingly negative and hostile during the next trip. He refused to help her get the project she had completed the work for approved even though he had written and submitted proposals for other students. He did not want Glidewell's partner, Morgan Brown (now Brown Russell), to attend. Buss yelled at Glidewell for seemingly no reason. At this point, Glidewell no longer felt welcome in the theatre department.

155. When Glidewell told Buss she intended to seek a transfer to NYU for her junior and senior year, Buss became angry with her. He tried to convince her not to even try, telling her that she was not good enough and would not make it. He refused to help with her audition tapes and actively failed to send the paperwork she needed for the transfer.

156. Glidewell did not transfer. Glidewell attempted to spend less time interacting with Buss, which made him more angry. Glidewell confided in Brown Russell that she had grown increasingly uncomfortable around Kato and Brown Russell in turn shared with her that Buss had touched her inappropriately on her buttocks. Around this time, Glidewell learned that Buss was involved in a sexual relationship with Summar. The pieces started to fit together.

157. In December 2017, Glidewell and Brown Russell filed reports with Title IX. Glidewell acted as a witness for Brown Russell and lodged a complaint about Buss' inappropriate behavior with her. (See Paragraphs 43-49 above.)

31

158. During a six-month internship with Disney World, Glidewell learned that Buss was found not responsible for any of the allegations she and Brown Russell had made. She was crushed. She had already experienced being black balled from the theatre department after the initial report and knew that she would not be safe at UCO.

159. To protect herself from further retaliation and harassment, Glidewell changed her major to General Studies with an emphasis in Theatre so that she could complete her degree online. Buss' actions and the university's failure to protect students left her feeling physically unsafe at UCO.

160. Glidewell reached out to faculty members at UCO to warn them about Buss, Charleen Weidell. Glidewell told Weidell that Buss  was a predator and to watch out for him because he was a danger to students. She reached out to Weidell again in May 2020 to warn her about Buss. Glidewell's warnings were and continue to be ignored.

### Morgan Brown Russell

Plaintiff Morgan Brown Russell ("Brown Russel") first met Buss when she began classes at UCO August 2014. Buss was the Head of Performance in the theatre department, so even though she was a theatre education major, Brown Russell took many of the theatre performance classes as a part of her degree. Since she also had an interest in performing, Brown Russell also auditioned for the productions for the year.

161. Her first week at UCO, Brown Russell auditioned for the productions and got a role in the play that Buss was directing. Immediately after she was cast, Buss began giving Brown Russell a lot more attention in class and asked her to come by his office just to talk. Buss told her that he likes to know the people he casts in his shows. When she went

to see him, Buss directed her to close the door so that no one else could bother them and explained that he liked to keep his attention "on one person at a time."

162. In that first meeting, Buss told Brown Russell she was the only freshman that he had cast in the show and asked her how she felt about that. Brown Russell told him that she was excited and felt honored, and that she would try to prove he made the right decision. Buss  asked her about her home life and some personal questions, like whether she was in a relationship and if she was involved with anyone in the department.

163. Many more meetings with Buss would follow. Buss asked Brown Russell about her mother, who had died by suicide when she was 15. Buss asked Brown Russell about her previous relationships. They talked about music a lot. On one occasion, Brown Russell was wearing a tank top that had Jim Morrison from the Doors on it. Brown Russell noticed that Buss kept staring at her chest and shirt and after class he asked her to follow him to his office. Brown Russell complied and Buss told her about how much he liked the Lizard King (Jim Morrison's nickname) and talked at length about how Morrison was like a Greek god in some ways and kept talking about him in a sexual context. Although the discussion made Brown Russell uncomfortable, she tried to brush it off.

164. About this same time, Buss gave Brown Russell  a "feature" in one of his productions. Buss added a scene/transition in the play where Brown Russell whipped another character while they crawled on their hands and knees without pants on. While Brown Russell was whipping this person with a whip, Buss directed her to be screaming and yelling "like it was getting me off." This scene addition came out of nowhere to me and the rest of the cast. Although she was not comfortable doing the scene, Brown Russell did not want to be seen at a prude or disappoint Buss, so she did it. During the scene,

Brown Russell noticed that Buss looked pleased, but not in as a director might be expected to be. Rather, it seemed that Buss was deriving satisfaction or gratification from it. Brown Russell began to question Buss' intentions but suppressed her concerns. He continued to give her positive feedback and attention in rehearsals and class and so she told herself she was exaggerating.

165. In February of 2015, Buss grabbed Brown Russell's buttocks in the lobby of Concho Hall on the Campus of Angelo State University while the UCO Theatre Department was there for the Kennedy Center American College Theatre Festival (KCACTF). That same night Buss, while supplying alcohol and watching underaged students drink, and drinking himself, offered for and encouraged Brown Russell to sleep in his hotel room with him.

166. Brown Russell did not know who to report this incident to besides Buss or to Chris Domanski, the then-assistant dean for UCO's College of Fine Arts and Design, who was also on that trip and who was also supplying alcohol to students. She was made to feel like she was getting special treatment on that trip by being the only freshman, so she did not want to upset anyone or seem ungrateful.

167. Brown Russell tried to act like the incident never happened and maintain good standing in the program. However, she never really felt safe in the program again. She felt that Buss vacillated between being upset with me for not accepting his advances and continuing to pursue an inappropriate relationship with her.

168. At the beginning of the Fall 2017 semester, Brown Russell told Gabrielle Glidewell about what had happened. Glidewell shared her own odd and uncomfortable experiences she had with Buss on a trip to Scotland. Although she became more concerned about

Buss, she remained hesitant to tell anyone else for fear of retaliation in the program for getting the head of department into trouble. Buss was well loved. She remained quiet and tried to distance herself.

169. Late in the Fall 2017 semester, Brown Russell learned from another student that Buss was having a sexual relationship with Summar. Brown Russell knew then that she could no longer remain silent. She told her Theatre Education Advisor Carrie Hill about the situation and asked what she should do. Hill referred her to UCO's Title IX office. Brown Russell filed a complaint, outlining her own experience when Buss touched her inappropriately and reporting Buss' sexual relationship with a student. (See Paragraphs 43-49 above).

170. The university found Buss not responsible and but directed Brown Russell and Buss to avoid contact with each other. Brown was assured that as a result of her complaint Buss would not be involved in a class required of students selected to go to the Kennedy Center American College Theater Festival (KCACTF) in the Spring of 2018. Buss was in fact involved in the class and Brown Russell was forced to perform two scenes in front of him. Creating more drama, Buss waited until the day before the group was set to travel to the festival to announce in front of the entire group that he would not be going on the trip.

171. The university offered Brown Russell no support or guidance on how she could continue in the program without being in contact Buss. The university knew that Buss ran the program and wrote an exception allowing contact for work or school business. Because there was no way to avoid interaction with Buss, Brown Russell  stopped participating in shows and in APO (the honor society for Theatre). Brown Russell was essentially also exiled from the program when Buss told others about her report against him.

172. During the two semesters in which the Brown Russell attempted to distance herself from Buss and in which she filed the Title IX complaint, Brown Russell was denied scholarship money she had received the previous three semesters. After the Title IX complaint was closed with no sanction against Buss, Brown Russell received scholarship money again.

## DISCRIMINATION ON THE BASIS OF GENDER
## IN VIOLATION OF 20 U.S.C. § 1681
## (TITLE IX)

173. Plaintiffs incorporate all paragraphs of this Complaint is if fully set forth herein.

174. UCO's acts and failures to act amounted to unlawful sexual harassment and discrimination on the basis of sex. The harassment and discrimination Plaintiffs suffered was sufficiently severe and pervasive to create an abusive, and sexually hostile educational environment for Plaintiffs. One or more UCO administrators or officials, with authority to take corrective action on Plaintiffs' behalf, had actual notice of said harassment and discrimination and failed to adequately respond, in violation of their own policies. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. As a result, Plaintiffs were subject to continuing harassment and loss of educational opportunities.

175. Defendant maintained a policy of indifference to sexual misconduct, including sexual harassment, on campus.

- Defendant intentionally discouraged students from pursuing "formal" complaints under Title IX, actively diverting them to an "informal HR process."

- Defendant knowingly and deliberately failed to comply with Title IX and its implementing regulations with regard to informal resolution of complaints against employees.

36

- Defendant maintained multiple conflicting and confusing policies regarding sexual harassment and sexual misconduct by employees.

- Defendant deliberately mislead students as to their rights under Title IX.

- Defendant failed to enforce its policies, creating an environment in which sexual misconduct was tacitly approved.

176. Defendant's policy of indifference created a heightened risk of sexual harassment on campus that was known and/or obvious to Defendant. Employee sexual misconduct was ignored and employees were empowered and emboldened to operate with impunity without fear of consequence. The heightened risk created by UCO's actions and inactions was realized when Plaintiffs suffered sexual harassment and sexual abuse perpetrated by a UCO employee.

177. UCO failed to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit or remedy the kind of gender-based discrimination that Plaintiffs suffered.  This failure included, without limitation, non-existent or inadequate customs, policies or procedures for the recognition, reporting, investigation and correction of unlawful gender-based discrimination. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur.  As a result, Plaintiffs were subject to continuing harassment and loss of educational opportunities.

178. Defendant knowingly and deliberately concealed the breadth of the problem of sexual misconduct on its campus, including within the theatre department. Prior to the assaults and harassment suffered by Plaintiffs, UCO had actual knowledge that sexual misconduct, sexual harassment and gender discrimination was widespread on its campus, including in

the theatre department.

179. Defendant failed to train its employees with respect to detecting, preventing and responding to sexual misconduct. Defendant failed to train its students with respect to identifying sexual misconduct, preventing its occurrence and reporting its occurrence.

180. As a result UCO's discrimination and deliberate indifference, Plaintiff have suffered loss of educational opportunities and/or benefits.

181. Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, and   have incurred and/or will incur expenses for medical and psychological treatment, therapy and counseling.

182. Plaintiffs have incurred, and will continue to incur, attorney's fees and costs of litigation.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff prays for damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

## **PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS**

Dated:  May 10, 2021                              Respectfully submitted,

*/s/ Sheila P. Haddock*
Sheila P. Haddock
sheila@zalkin.com
THE ZALKIN LAW FIRM, P.C.
10590 W. Ocean Air Dr., Ste. 125
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

*Attorney for Plaintiffs*